Kevin P. Simpson (Bar No. 344644)
**WINSTON & STRAWN LLP**
333 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 (213) 615-1700
kpsimpson@winston.com

-and-

Timothy W. Walsh (NY Bar No. 2436152)
(*pro hac vice* pending)
Carrie V. Hardman (NY Bar No. 4823225)
(*pro hac vice* pending)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Telephone: +1 (212) 294-6700
Facsimile: +1 (212) 294-4700
twwalsh@winston.com
chardman@winston.com

*Counsel for the Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. HARRINGTON, DEBRA ACHKIRE, STACY ALLRED, LIONEL ANTUNES, NORMA ARUJO, JASON BABB, KEVIN BARNES, BRETT BERRY, CARY BIREN, DAVID BLOOM, STEPHANIE BONTEMPS, ABE BORENSTEIN, CYNTHIA BOW, DAVID BRADY, KAREN BRATT, KYLE BRIGGS, JEFFREY BRUCE, BARBARA BRUSER, GEORGE BUZA, KEVIN CAREY, SUSAN CARLSON, RICHARD CHALIFOUX, THOMAS CHENG, SEEMA CHETAL, SIDNEY CHEUNG, EVE CHIN, JULIE CHIN, SANAH CHUNG, CAMERON CLIFFORD, TERENCE CONDREN, KAREN CONWAY, GINA COSTELLO, REBECCA DECESARO, GLENN DEGENAARS, JIM DENVER, ED DOBRANSKI, MURAT DOGANAKSOY, SCOTT DUFRESNE, DIANA MOMJIAN ELTON, SILVIA FERNANDEZ, DOUG FIEK, SCOTT FINDER, TOM FINNEGAN, MIKE FRANKS, JOHN FREY, WES FUKUMORI, YVA GALLANT, STEVE GANOTIS, MARK GENOVESE, MICHAEL | Case No.: 3:23-cv-06296 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

GLYNN, GREG GOOCH, RICK GORDON,
SUJIT GOVINDRAJ, WILLIAM GRAHAM,
JAYVEE GULMATICO, MATTHEW HALL,
JERALD HALVERSON, HOOMAN
HAMZEH, JOE HARPSTER, TIGE HARRIS,
BRADY HARTER, RENE HENRIKSEN,
MICHAEL HERRON, MIRANDA HOLMES,
ANDREW HOLTZ, AMY HONG, MARY
JANE HOOD, LYNDSEY HUDGINS,
JACQUELINE HUIE, JEFFREY IHRIG,
ASPASIA IOSIFELLIS, RICK ISRAEL,
MAYANK JOHRI, MARK JONES, SHARON
JONES, JASON KAIMER, FAZAL KAKA,
ROBERT KARSON, FRANK KEANE, KEN
KEARNS, BASANT KEDIA, MARK
KEMLER, ALEX KUKURUDZ, PAUL KYE,
JEANMARIE LABONTE, DARA LANDA,
ANNA HOWARD LAVARY, ALAN LE
VINE, JACK LEE, LISA LEMONS, KAY
LEVIS, JEFFREY OBERHAUSER-LIM,
MIRANDA LIN, ANDREW LIOU, BRIAN
LITMAN, MARGARET LIU, RICHARD
LOMBARDOZZI, TOM LONGSTROTH,
JOSHUA LUKS, JEFF MAIER, STEPHEN
MAROTTO, MAUREEN MCNALLY, JOHN
MCNAMEE, KANIKA MEDIRATTA,
VICTOR MENA, CHRIS MERRIFIELD,
DAVID MOE, ROBERT MOREHEAD, JOHN
MORONEY, KARIN NAPEL,
NIRMALA NARINE, WILLIAM NEIL,
LUCAS NEWMAN, LOURDES OCHOA, JIM
OCHSNER, JENN O'REILLY, BARBARA
PALMER, FRANCIS PARSON, ARTHUR
PENSATO, RANDY PETERSON, MICHELE
PICCIRILLO, GARY POLLOCK, CHARLES
RADCLIFFE, CHAD REGO, PAUL
REINSMITH, ALAN REMEDIOS, STEVE
ROCHLIN, LYNN RODRIGUEZ, JO-ANN
ROSE, RICHARD SCARPELLI, THOMAS
SCHEIDIG, ADAM SCHLESINGER, JULIA
SCHNEIDER, MICHAEL SCHWARTZ,
JEAN MARIE SCUNGIO, NANCY
SEGRETO, ERIC SEUBERT, MARJAN
SHARIAT, MIKE SHAYESTEHFAR, LISA
SIEGEL, ALAN SIQUEIRA, STEVE SOJA,
DAN SOKOL, AMIE STEVENS, GREGORY
TANZER, PAULA TONI TARTAMELLA,
JOE THOMASON, MICHAEL TINNEY,
STEVE TROMP, CORINNA WAN,
CHRISTINE WANG, KAREN
WEISSENBACH, ELISE WEN, ALISON
WESTBROOK, JILL ANN WHITBY,
DANIEL WHITE, BRENT WIBLIN, JAMES
WILCOX, MARK WILLIAMS, EMILY WU,
JEFFREY YANDLE, TRAYHWA YVONNE

1  YANG, DERRICK YEE, CHITRA
   YELLAJOSYULA, MICHAEL ZAZZARA,
2  BART ZITNITSKY, SAM ZOOB, AND
   MARGARET ZYWICZ,
3
            Plaintiffs,
4
       vs.
5
   FEDERAL DEPOSIT INSURANCE
6  CORPORATION, as Receiver for First
   Republic Bank,
7
            Defendant.
8

9       The above-captioned plaintiffs (the "Plaintiffs"), by and through their counsel, allege the

10 following based upon personal knowledge as to themselves and their own acts, and upon information

11 and belief as to all other matters, including the investigation of Plaintiffs' counsel, which included,

12 among other things, press releases published by the First Republic Bank (the "Bank" or the

13 "Company"), public statements and reports made by the Federal Deposit Insurance Corporation—in

14 its capacity as receiver to First Republic Bank (the "Defendant," "FDIC," or "Receiver"), media

15 reports concerning the Company, judicial filings and opinions, employment agreement and

16 termination letters, the First Republic Bank Non-Qualified Deferred Compensation Plan Trust and

17 accompanying First Republic Bank Non-Qualified Deferred Compensation Plan Trust Agreement, and

18 other publicly available information.  Plaintiffs believe that significant additional evidentiary support

19 exists for the allegations set forth herein after a reasonable opportunity for discovery.

20                            **INTRODUCTION**

21      1.      The Plaintiffs constitute a majority of the then current and former employees of First

22 Republic Bank whose hard-earned wages and other compensation (and collateral designated to secure

23 such wages and compensation) is tied up in a trust that the Bank's receiver has not released.  Instead,

24 the above-captioned Defendant, the Federal Deposit Insurance Corporation—in its capacity as receiver

25 to First Republic Bank—has relegated the Plaintiffs to wholly general unsecured creditor status,

without regard to the specifically earmarked assets intended to secure the Plaintiffs earned wages, which threatens the Plaintiffs' ability to recover their earned wages and compensation. The Plaintiffs rely on this compensation—it's key to their retirement and financial stability—and without this Court's intervention, nothing will stop the FDIC from dissipating the assets set forth in the trust at any time, kicking the Plaintiffs to the end of the line, and leaving them with pennies on the dollar of the collateral to which they are lawfully owed.

2.      Specifically, this case arises from the actions of the Defendant, the FDIC in its capacity as Receiver in the Bank's receivership (the "Receivership") established by the California Department of Financial Protection and Innovation for the Bank with respect to the Bank's First Republic Bank Non-Qualified Deferred Compensation Plan Trust (the "Rabbi Trust"). The Plaintiffs constitute a majority of the participants of that certain First Republic Deferred Compensation Plan, effective July 1, 2018 (as amended and restated, the "Plan" or the "Deferred Compensation Plan").

3.      Pursuant to the Plan, the Plaintiffs deferred certain of their justly-earned wages and compensation for retirement planning purposes. (*See Declaration of Michael J. Harrington in Support of Plaintiff's Complaint and Motion for (1) Temporary Restraining Order; (2) Order to Show Cause Regarding Preliminary Injunction; and (3) Expedited Discovery*, ¶ 4 (the "Harrington Decl.")). The Bank established the Rabbi Trust which, among other things, houses assets intended to secure the deferred wages and other compensation obligations of the Bank to the Bank's Plan participants, including the Plaintiffs. Accordingly, the Plaintiffs have a legal and equitable right to the Rabbi Trust assets as beneficiaries of the Rabbi Trust, and have made due demand on the Defendant in an exercise of such rights, to no avail.

4.      Despite the Plaintiffs' rights to the Rabbi Trust assets, on or about May 18, 2023, Plan payments to Rabbi Trust participants, including the Plaintiffs, stopped. (Harrington Decl., ¶ 10). The Defendant—by stopping Plan payments to Deferred Compensation Plan participants and, upon due

demand, refusing to turn over the Rabbi Trust assets to the Plaintiffs—has asserted wrongful dominion and has, thereby, wrongfully converted the Rabbi Trust assets. The Defendant has also begun to issue letters to the Plaintiffs, in which the Defendant has improperly classified the Plaintiffs' deferred wages and other compensation claims as wholly general unsecured claims, without regard for their rights to the Rabbi Trust assets. (Harrington Decl., ¶ 12). Based on the balance sheet issued by the Defendant on or about October 26, 2023[1] it is expected that general unsecured claimants will recover little, if anything, on account of their claims. Similar to that of other retirement vehicles, these payments are a significant and crucial source of income for participants of the Plan, including the Plaintiffs. Absent judicial intervention, as part of the Defendant's duties in the Receivership to marshal and liquidate assets, the Defendant may attempt to dissipate the Rabbi Trust assets at any time, thereby relegating the Plaintiffs to rely only on status as a general unsecured creditor and permanently hindering their rightful claims to such Rabbi Trust assets.

## PARTIES

5.     The Plaintiffs are former employees of the Bank and constitute the majority of total participants in the Plan.

6.     The Defendant is the Federal Deposit Insurance Corporation, in its capacity as receiver to First Republic Bank in the Receivership established by the California Department of Financial Protection and Innovation (the "CDFPI").

## JURISDICTION AND VENUE

7.     This is an action brought pursuant to the Declaratory Judgment Act (28 U.S.C. sections 2201 and 2202) and the California Civil Procedure Code sections governing quiet title (Cal. Civ. Proc. Code section 760.010 *et seq.*), and constructive trusts (Cal. Civ. Code sections 2223 & 2224).

---

[1] FDIC: DIF Balance Sheet – Second Quarter 2023, October 26, 2023, available at https://www.fdic.gov/about/financial-reports/corporate/cfo-report-2ndqtr-23/balance.html.

8.     This Court has jurisdiction to consider this matter pursuant to the Federal Deposit Insurance Act[2] (including, without limitation 12 U.S.C. section 1821(d)(6)) and 28 U.S.C. sections 1331 & 1349.

9.     Venue is proper in this District under 12 U.S.C. section 1821(d)(6) and under 28 U.S.C. section 1391, as the Defendant resides in this judicial district, a substantial part of the events or omissions giving rise to the claims herein occurred in this District, and a substantial part of property that is the subject of the action is situated in this District.

## FACTUAL BACKGROUND

10.     First Republic Bank was a California state-chartered bank that provided private banking, private business banking, and private wealth management. (Harrington Decl., ¶ 2). At the time the Receivership (defined and described below) was implemented, the Plaintiffs were current and former employees of the Bank who constitute a majority of the participants in the Bank's deferred compensation plan (i.e., the Plan). (Harrington Decl., ¶ 3).

11.     Under the Plan, eligible officers and employees elected to defer receipt of justly-earned wages and compensation earned until a later time and on terms selected by each participant (from a list of options provided by the Bank). (Harrington Decl., ¶ 4). The deferred amounts were invested in the manner elected by the respective employee, and, at Plan formation, the Bank securitized the obligations through certain investment accounts to ensure payment of such deferred amounts at the time and frequency that Bank employees so elected. (Harrington Decl., ¶ 4).

12.     In or around 2018, the Bank pursued a different method to secure the obligations owed to Deferred Compensation Plan participants. In particular, the Bank formed the Rabbi Trust, and Charles Schwab Bank was appointed as trustee (the "Trustee"). The Rabbi Trust is governed by that certain Trust Agreement, dated June 29, 2018 (the "Rabbi Trust Agreement"). The Rabbi Trust, among

---

[2] 12 U.S.C. §§ 1811 *et seq.*

other things, houses assets intended to secure the deferred wages and compensation obligations of the Bank to the Bank's Plan participants, including the Plaintiffs.  (Harrington Decl., ¶ 5).  Accordingly, the Plaintiffs have a legal and equitable right to the Rabbi Trust assets as direct or indirect beneficiaries as further outlined in detail below.

13.    Prior to the Receivership, Deferred Compensation Plan participants were paid by the Bank on account of their deferred compensation in the frequency in which each participant elected. Similar to that of other retirement vehicles, these payments are a significant and crucial source of income for participants of the Plan, including the Plaintiffs.  (Harrington Decl., ¶ 6).

14.    In or around 2018, pursuant to the Rabbi Trust Agreement and Plan, the Bank acquired certain company owned life insurance (the "COLI") specifically to secure the Banks' obligations to Deferred Compensation Plan participants (including the Plaintiffs) under the Plan, which was subsequently contributed to the Rabbi Trust.  (Harrington Decl., ¶ 7).  Such COLI was segregated in accounts held by the Rabbi Trust as a collateral earmarked solely to securitize the obligations due and owing to Deferred Compensation Plan participants, including the Plaintiffs. (Harrington Decl., ¶ 7). While Plaintiffs did not perfect their security interest in such collateral, it was always understood that such earmarked assets were solely available for their recovery.

15.    The primary objective of COLI is to fund certain types of employee benefit plans, including nonqualified deferred compensation plans.[3] Before a COLI can be enacted, consent should be sought from those insured employees and notice be sent as to the Bank's administrative designation as a beneficiary.[4]  Consequently, in order to acquire the COLI in the first place, and to the extent the Bank periodically sought to increase coverage under such policy, on a number of occasions, the Bank

---

[3] *See* Guidelines on Corporate Owned Life Insurance, National Association of Insurance Commissioners, Dec. 1, 2023, available at https://content.naic.org/sites/default/files/inline-files/MDL-602.pdf; Congressional Research Service: Corporate-Owned Life Insurance and Tax Issues, Jan. 21, 2011, available at https://crsreports.congress.gov/product/pdf/RL/RL33414/7.
[4] *See id.*

sought written consent from the insured employees, including certain or all of the Deferred Compensation Plan participants, to acquire the COLI.  (Harrington Decl., ¶ 8).  When consent was sought from the insured employees, the Bank noted that it was the primary (but not sole) beneficiary of such policy.  (Harrington Decl., ¶ 8).  Once the COLI was established, insuring the lives of certain Bank employees, as noted above, the policy itself was contributed to the Rabbi Trust, and any death benefits and cash value from that policy (i.e., proceeds of the COLI) were for the sole benefit of the Deferred Compensation Plan participants.  (Harrington Decl., ¶ 8). The COLI continues to secure the obligations due and owing to the Deferred Compensation Plan participants (including the Plaintiffs). The Plaintiffs understand that such asset has a cash surrender value of at least $150 million.

16.    On May 1, 2023, the CDFPI closed the Bank and appointed the FDIC to serve as Receiver.  According to the FDIC, as of March 31, 2023, the Bank had total assets of $232.9 billion and total deposits of $104.5 billion.[5]  The Bank was the fourteenth largest bank in the country, and the second largest bank supervised by the FDIC, and its failure constituted the second largest bank failure in United States history.

17.    The proximate cause of the Bank's failure was a contagion event that stemmed from the failure of other prominent financial institutions, including Silicon Valley Bank.[6] The collapse of Silicon Valley Bank caused investor and consumer mistrust in large regional banks, resulting in a run on other banks, including First Republic Bank.[7]

18.    Also in May 2023, FDIC Chairman Martin J. Gruenberg commissioned the FDIC's Chief Risk Officer with conducting an internal review of the agency's supervision in the years leading up to the Bank's placement into the Receivership.

---

[5] FDIC's Supervision of First Republic Bank, Sept. 8, 2023, available at https://www.fdic.gov/news/press-releases/2023/pr23073a.pdf.
[6] OIG: Material Loss Review of First Republic Bank, Nov. 29, 2023, available at https://www.fdicoig.gov/reports-publications/bank-failures/material-loss-review-first-republic-bank.
[7] FDIC Releases Report Detailing Supervision of the Former First Republic Bank, San Francisco, California, press release, Sept. 8, 2023, available at https://www.fdic.gov/news/press-releases/2023/pr23073.html.

19.     On September 8, 2023, the FDIC's Chief Risk Officer issued a report detailing its findings.[8]  The report indicated as major factors contributing to the Bank's failure an overreliance on uninsured deposits and failure to sufficiently mitigate its interest rate risk.  In the first quarter of 2023, the Bank had lost over $100 billion in deposits, causing a negative market response and a ratings downgrade.

20.     The report also highlighted the failure of the FDIC's San Francisco Regional Office in its supervisory role with respect to the Bank.  Specifically, the FDIC found that it failed to take meaningful action to mitigate the Bank's interest rate risk and to address weaknesses in its funding concentrations that would have made the Bank more resilient.  Notably, in the months prior to the Bank's closure, the FDIC did not have any open supervisory recommendations or enforcement actions related to the causes of the Bank's closure.[9]

21.     A report issued by the Office of Inspector General of the FDIC (the "OIG") in late November 2023 further highlighted the shortcomings of the FDIC, stating that the FDIC missed opportunities to take on earlier supervisory actions consistent with its forward-looking supervisory approach.[10]  The OIG concedes that any FDIC supervisory actions would likely have not prevented the Bank's closure, but earlier supervisory actions may have resulted corrective action on the part of the Bank and possibly reduce its susceptibility to contagion risk or reduce the loss sustained.[11]

22.     Prior to the Bank's entry into the Receivership, the FDIC received significant interest from a number of potential purchasers, including Citizens Bank, PNC Bank, and JPMorgan, to acquire substantially all of the Bank's assets, operations, and obligations.[12]

---

[8] *Id.*

[9] OIG: Material Loss Review of First Republic Bank, November 29, 2023, available at https://www.fdicoig.gov/reports-publications/bank-failures/material-loss-review-first-republic-bank.

[10] *Id.*

[11] *Id.*

[12] Prentice, Chris, et al., PNC, JPMorgan putting in final bids for First Republic bank in FDIC auction, May 1, 2023, available at https://www.reuters.com/business/finance/pnc-jpm-putting-final-bids-first-republic-fdic-auction-sources-2023-04-30/.

COMPLAINT

23.     The Defendant selected, negotiated and entered into a transaction to sell substantially all of the assets of the Bank to JPMorgan.  As part of those negotiations, deposits were honored and business continued as to nearly all creditors of the Bank.  When it came to the Bank's then-current employees, JPMorgan provided offers to transition certain of the Bank's employees to become JPMorgan employees.  (Harrington Decl., ¶ 9).   Of those who were provided offers, in an effort to incentivize acceptance, JPMorgan provided to certain of those Bank employees restricted stock to account for the failure to assume obligations on behalf of those employees relative to the Deferred Compensation Plan. (Harrington Decl., ¶ 9).  The letters received from JPMorgan did not provide for payment of the Rabbi Trust assets, nor did it provide for payment of any of the current or former employees' justly-earned deferred compensation.  (Harrington Decl., ¶ 9).

24.     As is reflected in the sale transaction documents, JPMorgan expressly did not assume the assets and/or liabilities that exist under the Deferred Compensation Plan.  The Defendant agreed to carve out the Deferred Compensation Plan obligations from JPMorgan's assumption and acquisition of substantially all of the Bank's assets, operations, and other liabilities.  Thus, as a result of the sale to the bank of the Defendant's choosing, and on the terms the Defendant negotiated and closed, obligations to nearly all creditors of the Bank were honored, except for the obligations to the Bank's employees under the Deferred Compensation Plan.

25.     Despite the Plaintiffs' rights to the Rabbi Trust assets, including payments under the Deferred Compensation Plan, on or about May 18, 2023, the Defendant directed the stop of Plan payments to Deferred Compensation Plan participants, including the Plaintiffs.  (Harrington Decl., ¶ 10).  As described below, the Plaintiffs demanded return of the Rabbi Trust assets and, to date, the Defendant has not complied with such demand.

26.     Pursuant to 12 U.S.C. section 1821(d)(6)(B)(ii), the FDIC established September 5, 2023, as the deadline to submit claims against the Bank for consideration by the Receivership.  The

Plaintiffs timely submitted their claims to the FDIC thereon.  (Harrington Decl., ¶ 11).  Included with the Plaintiffs' claims were letters from the Plaintiffs, dated August 31, 2023, providing the Defendant notice of the Plaintiffs' position relative to the Rabbi Trust assets, including that the COLI is for the singular benefit of the Deferred Compensation Plan participants, and made formal demand for the FDIC to turn over the Rabbi Trust assets accordingly.  (Harrington Decl., ¶ 15).  To date, the Defendant has not turned over the Rabbi Trust assets and has not responded to the Plaintiffs' position regarding their right to direct recovery from the Rabbi Trust assets, other than to maintain the position that Plaintiffs are wholly general unsecured creditors of the Bank.

27.     In or around August 2023, the FDIC issued letters to Plan participants notifying them of the FDIC's intent to repudiate the Deferred Compensation Plan, citing the "burdensome" nature of the Plan.[13]  (Harrington Decl., ¶ 12). Beginning in August 2023, the FDIC also issued letters stating its intention to allow (in full or in part) or deny (in full or in part) the Deferred Compensation Plan participants' claims as general unsecured claims (the "Claim Letters" or each a "Claim Letter").[14] (Harrington Decl., ¶ 12). The Plaintiffs dispute the treatment of the claims as general unsecured claims to the extent that such proposed treatment by the Defendant excludes direct recovery from the Rabbi Trust assets.[15]

28.     As set forth in the Claim Letters, the Defendant proposes to treat Deferred Compensation Plan participants (including the Plaintiffs) as general unsecured creditors, with no acknowledgement of a right to the Rabbi Trust assets.  (Harrington Decl., ¶ 13). Such treatment would

---

[13] A true and correct copy of one sample letter is appended to the Harrington Declaration at Ex. D.  Such letter is redacted for personally identifiable information, as such information is both personal and irrelevant to the issues subsumed in this Complaint.

[14] A true and correct copy of one Claim Letter is appended to the Harrington Declaration at Ex. E.  Such Claim Letter is redacted for personally identifiable information and for the purported claim amount, as such information (reflecting a Plaintiff's personal retirement funds) is both personal and irrelevant to the issues subsumed in this Complaint.

[15] Plaintiffs submit that most have received their respective copy of the Claim Letter, indicating a treatment of their claim as a wholly general unsecured claim. To the extent any one Plaintiff has yet to receive their respective Claim Letter, it is anticipated that Defendant's proposed treatment of similarly situated creditors will remain the same.

entitle the Plaintiffs to recover—not directly from the Rabbi Trust assets, but indirectly via distributions from the Receiver—potentially pennies on the dollar on account of their claims for their undisputed earned wages under the Deferred Compensation Plan.  Based on the balance sheet issued by the Defendant on or about October 26, 2023 it appears that the FDIC expects general unsecured claimants will recover little, if anything, on account of their claims. Said simply, the Defendant's position intends to hinder Deferred Compensation Plan participants' (including the Plaintiffs) rights under the Deferred Compensation Plan and Rabbi Trust.

29.    The Rabbi Trust assets, including the proceeds of the COLI—having been earmarked and segregated solely for direct recovery by Deferred Compensation Plan participants (including the Plaintiffs)—are not available for marshalling for the benefit of the general unsecured creditors of the Bank.  Rather such Rabbi Trust assets—particularly the COLI and proceeds therefrom—are solely available for the benefit of Deferred Compensation Plan participants (including the Plaintiffs) and intended to secure the Bank's obligations to the participants with respect to their deferred wages and compensation contributed under the Plan.  Specifically, the Rabbi Trust Agreement provides, in relevant part, that "the Company may contribute to the Rabbi Trust assets that will be held therein, subject to the claims of the Company's creditors in the event of the Company's Insolvency, as herein defined, ***until paid to Plan participants and their beneficiaries in such manner and at such times as specified in the Plan*** . . . ." (emphasis added).  Furthermore, as evidenced by the Bank obtaining consent from certain of the insured employees (including the Plaintiffs), noting that the Bank would serve as the primary (but not sole) beneficiary of such policies, the Plaintiffs serve as direct or indirect beneficiaries of the Rabbi Trust and, thus, are entitled to direct recovery of the COLI obtained to secure obligations to the Plaintiffs.

30.    The Plaintiffs and the Defendant have been communicating with respect to their respective positions on various issues since at least August 2023, if not earlier (Harrington Decl., ¶ 14).

On October 27, 2023, the FDIC confirmed to the Plaintiffs that it has standing to request and obtain copies of the policy or policies evidencing the COLI. (Harrington Decl., ¶ 14). The Plaintiffs made demand on the FDIC, both formally and informally, for copies of the policy and or policies evidencing the COLI. In particular, by letter dated October 31, 2023, the Plaintiffs made formal request of the Defendant for information and/or documentation evidencing the nature and extent of assets in Trustee's possession, including in particular any copies of the insurance policy or policies collateralizing the COLI. (Harrington Decl., ¶ 14). To date, the FDIC has refused to provide such policy to the Plaintiffs.

31.    On November 29, 2023, the Plaintiffs levied against the FDIC a demand letter for the Rabbi Trust assets (the "Due Demand") and, again, a copy of the relevant policies governing the COLI. (Harrington Decl., ¶ 15). At the time of filing this Complaint, the Defendant has not complied with the Plaintiffs' Due Demand.

### COUNT I
### Request for Declaratory Judgement
### (28 U.S.C. sections 2201 and 2202)

32.    The Plaintiffs repeat, reallege, and incorporate by reference the allegations made in paragraphs 1 through 31, as is fully set forth herein.

33.    Plaintiffs dispute the Defendant's classification of the Plaintiffs' claims as general unsecured claims to the extent that Defendant fails to acknowledge Plaintiffs' right to direct recoveries of the Rabbit Trust assets. Given that the language of the Rabbi Trust Agreement indicates that the principal and earnings of the Rabbi Trust is to be held for the exclusive benefit of the Deferred Compensation Plan participants (including the Plaintiffs), thus permitting the Plaintiffs to recover directly from the proceeds of the Rabbi Trust as a beneficiary and not as a general unsecured creditor. Furthermore, the Plaintiffs believe the COLI policy further evidences the Plaintiffs' rights to recover directly the assets of the Rabbi Trust (including the COLI).

34.    Plaintiffs further dispute that the Defendant is entitled to exercise dominion over and

to use the Rabbi Trust assets (in particular, the COLI) for the benefit of general unsecured creditors other than the Deferred Compensation Plan participants. Instead, the Plaintiffs' position—which the Defendant disputes—is that the Deferred Compensation Plan participants (including the Plaintiffs) are the sole claimants entitled to recover the Rabbi Trust assets (in particular, the COLI) for their benefit.

35.    To date, the Defendant has not turned over such assets upon the Plaintiffs' Due Demand for the Rabbi Trust assets, including without limitation, the COLI and their respective proceeds.  Nor has the Defendant agreed to preserve or provide and/or liquidate the Rabbi Trust assets for recovery solely by Deferred Compensation Plan participants, including the Plaintiffs.

36.    Defendant's position with respect to the Rabbi Trust assets denies the Plaintiffs their right to payment of the Rabbi Trust assets and/or proceeds therefrom, instead improperly relegating the Plaintiff's entire claim to status no greater than that of a *general* unsecured claim against the Bank.

37.    The Plaintiffs are entitled to a declaratory judgement that (A) the Plaintiffs are entitled to recover directly, from the proceeds of the assets in possession of that certain Trust including, without limitation, any proceeds of the COLI that are in possession of the Rabbi Trust, and (B) the Receiver lacks rights to utilize the Rabbi Trust proceeds from the COLI to pay other general unsecured creditors, as such rights to recovery should inure to the Deferred Compensation Plan participants (including the Plaintiffs). There exists a substantial controversy between the Plaintiffs and Defendant of sufficient immediacy and reality to warrant the issuance of a declaratory judgment pursuant to the Declaratory Judgment Act (28 U.S.C. section 2201.  A prompt judicial determination of the respective rights and duties of the parties in these respects is necessary and appropriate.

## COUNT II
### Quiet Title
### (Cal. Civ. Proc. Code section 760.010 *et seq.*)

38.    The Plaintiffs repeat, reallege, and incorporate by reference the allegations made in paragraphs 1 through 37, as is fully set forth herein.

39.     For the reasons stated above, as of the date of this Complaint, the Plaintiffs have a legal and equitable right to the Rabbi Trust assets, including without limitation the COLI, and proceeds therefrom.  Participants' claim to ownership rights over the Rabbi Trust assets is based on the clear language of the Rabbi Trust Agreement which states, in relevant part, that the principal of the Rabbi Trust and any earnings shall be used exclusively for benefit of the Deferred Compensation Plan participants (including the Plaintiffs).  Such language is further supported by the intention behind obtaining the COLI and its segregation as an asset away from the pool of assets available for other creditors.  Further, the Bank's request for the consent of certain insured employees to acquire COLI suggests that, although the Bank is a primary beneficiary of the Rabbi Trust, it is not the sole beneficiary. Moreover, the Plaintiffs understand the COLI policy provides that Deferred Compensation Plan participants (including Plaintiffs) are direct or indirect beneficiaries of the Rabbi Trust.  The Defendant's claim to title of such assets constitutes an adverse claim to the Rabbi Trust assets.

40.     Accordingly, the Plaintiffs are entitled to a determination and enjoyment of quiet title as to the Rabbi Trust assets including, without limitation, the COLI, and proceeds therefrom.

### COUNT III
### Conversion

41.     The Plaintiffs repeat, reallege, and incorporate by reference the allegations made in paragraphs 1 through 40, as is fully set forth herein.

42.     The Plaintiffs have repeatedly apprised Defendant of their claim to ownership rights to the Rabbi Trust assets, including by way to formal written Due Demand for the return of the Rabbi Trust assets delivered to Defendant on November 28, 2023.

43.     As a result of the Defendant's refusal to turn over the Rabbi Trust assets upon Due Demand, the Defendant has asserted wrongful dominion and has converted the Rabbi Trust assets (including, for avoidance of doubt, the COLI and the proceeds therefrom).

44.     Due to the Defendant's wrongful and continued control of the Rabbi Trust assets, the

Deferred Compensation Plan participants (including the Plaintiffs) have been denied their rights to receipt of the Rabbi Trust assets and/or the proceeds therefrom. The Defendant's position that Deferred Compensation Plan participants (including the Plaintiffs) are entitled to no more than general unsecured claims, without acknowledgement of the direct rights against the Rabbi Trust assets, subjects those participants to payments in amounts less than to what they are legally entitled. Furthermore, each day the Defendant refuses to provide the Plaintiffs access to the Rabbi Trust assets, the more damage incurred by the Plaintiffs, as the Plaintiffs rely on receipt of Plan payments for their livelihood.

### COUNT IV
**Constructive Trust**
**(Cal. Civ. Code sections 2223 & 2224)**

45.     The Plaintiffs repeat, reallege, and incorporate by reference the allegations made in paragraphs 1 through 44, as is fully set forth herein.

46.     To date, the Defendant has asserted wrongful dominion over and detention of the Rabbi Trust assets, despite the Plaintiffs' levy of Due Demand to turn over the Rabbi Trust assets (including, for avoidance of doubt, the COLI and proceeds therefrom) and has deprived the Plaintiffs of their right to access those assets and/or any payments arising therefrom.

47.     Irrespective of the Plaintiffs' treatment as general unsecured claimants of the Receivership, the Rabbi Trust assets are the property of the Plaintiffs. As is commonplace in the market, the Bank obtained the Rabbi Trust assets (including, in particular, the COLI and its cash value) for the express purpose of securing the obligations due and owing to the Deferred Compensation Plan participants of the Plan. Such Rabbi Trust asset—the COLI—was segregated solely for the benefit of Deferred Compensation Plan participants (including Plaintiffs). The COLI, as an asset of the Rabbi Trust, continues to secure the obligations due and owing to the Deferred Compensation Plan participants and, the Rabbit Trust assets are available solely for the benefit of the Deferred Compensation Plan participants (including the Plaintiffs). In light of the unique nature of the asset

secured solely for the Plan participants' benefit, different from the treatment of other general unsecured claims, Plaintiffs are entitled to a constructive trust over the Rabbit Trust assets to preserve their rights to utilize same in defraying their otherwise general unsecured claims.

48.     Pursuant to Cal. Civ. Code sections 2223 & 2224, Plaintiffs request, in law and in equity, that this Court impose a constructive trust over the Rabbi Trust assets (including the COLI) in order to safeguard the Plaintiffs' ownership rights to the Rabbi Trust assets.

## COUNT V
### Preliminary Injunctive Relief

49.     Plaintiffs repeat, reallege, and incorporate by reference the allegations made in paragraphs 1 through 48, as is fully set forth herein.

50.     As a result of the Defendant's conduct, as described above, the Plaintiffs have been denied their rights to receipt of the Rabbi Trust assets and/or the proceeds therefrom.  If the Defendant is permitted to use the Rabbi Trust assets, it would drastically limit the very assets from which the Plaintiffs can recover.

51.     A grant of injunctive relief would not cause undue harm to the Defendant as the Defendant has yet to indicate its intent to begin making payments to creditors. Alternatively, the Plaintiffs face an immediate loss of direct access to the Rabbi Trust assets and are subject to treatment as wholly general unsecured creditors, thus receiving payments in amounts less than to what they are legally entitled.

52.     As stated herein, the Plaintiffs' claim to ownership rights over the Rabbi Trust assets stems from the clear language of the Rabbi Trust Agreement which provides that the principal of the Rabbi Trust and any earnings shall be used for benefit of the Deferred Compensation Plan participants (including Plaintiffs).  Moreover, the Plaintiffs understand the COLI policy provides that Deferred Compensation Plan participants (including Plaintiffs) are direct or indirect beneficiaries of the Rabbi Trust.  The Plaintiffs are confident that additional evidentiary support exists for its claim to ownership

over the Rabbi Trust assets after a reasonable opportunity for discovery.

53.     Accordingly, the Plaintiffs seek an order of injunctive relief against Defendant to prohibit Defendant from using the Rabbi Trust assets (including, for avoidance of doubt, the COLI and proceeds therefrom) and directing the Defendant to expeditiously turn over the Rabbi Trust assets so that no further harm is caused to the Plaintiffs pending the adjudication of the resolution of the claims asserted herein.

### **PRAYER**

WHEREFORE, Plaintiffs pray that this Court enter judgement in favor of Plaintiffs and against Defendant:

A.     declaring that the Rabbi Trust assets, including without limitation, the COLI, and proceeds therefrom, are available solely for the benefit of the Deferred Compensation Plan participants (including the Plaintiffs);

B.     declaring that the Plaintiffs are entitled to recover the Rabbi Trust assets, including without limitation, the COLI, and proceeds therefrom;

C.     declaring that the Defendant may not utilize the Rabbi Trust assets to pay any other creditors beyond the Deferred Compensation Plan participants (including the Plaintiffs);

D.     provisionally entering an order of attachment, a temporary restraining order, and/or a preliminary injunction prohibiting the Defendant from engaging in any transfer, sale, liquidation, or other disposition of any Rabbi Trust assets; and

E.     granting such further relief as requested herein and as is just and proper.

Dated: December 5, 2023

Respectfully submitted,

/s/ Kevin P. Simpson

Kevin P. Simpson (Bar No. 344644)
**WINSTON & STRAWN LLP**
333 S Grand Avenue
Los Angeles, CA 90071

Telephone: +1 (213) 615-1700
kpsimpson@winston.com

-and-

Timothy W. Walsh (NY Bar No. 2436152)
(*pro hac vice* pending)
Carrie V. Hardman (NY Bar No. 4823225)
(*pro hac vice* pending)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Telephone: +1 (212) 294-6700
Facsimile: +1 (212) 294-4700
twwalsh@winston.com
chardman@winston.com

*Counsel for the Plaintiffs*

COMPLAINT